IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERTO ANTONIO RAYA,

    Petitioner,               No. CIV S-03-1726 MCE KJM P

    vs.

D.L. RUNNELS, et al.

    Respondents.        FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a California prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. He challenges his 2001 Sacramento County conviction for manufacturing methamphetamine, possession of pseudoephedrine with intent to manufacture methamphetamine, and transportation of methamphetamine. Petitioner was sentenced to 17 years and 8 months in prison.

I.    Factual and Procedural Background

        On direct appeal, the Third Appellate District of the California Court of Appeal summarized the facts elicited at petitioner's jury trial as follows:

> Officers James Smith and Joe Marsac were on traffic patrol at about 1:00 a.m. on September 14, 1999. They saw a Chevy Blazer enter Interstate 80 from Northgate Boulevard heading north; its four-way flashers were on, its speed fluctuated, and it was weaving. The Blazer exited the freeway at Norwood Avenue.

1

Suspecting driving under the influence, the officers followed and stopped the Blazer in the parking lot of a Jack-in-the-Box Restaurant. Raya was driving the Blazer and Wakefield was the passenger.

Raya told the officers he had no license as his had expired. He explained the Blazer was his neighbor's and he borrowed it to get some Pepsi for his wife. A search of Raya revealed a plastic baggie with a brownish-yellowish substance resembling methamphetamine in his pocket. It was stipulated there were .14 grams of a substance containing amphetamine and methamphetamine. Raya struggled as he was placed under arrest. He said the methamphetamine was his wife's and must have been in the wad of money she gave him for the Pepsi. Wakefield was searched for weapons and released.

Two cash register receipts were also found in Raya's pocket. The first was from Save Max Foods, with a purchase time about 30 minutes earlier, for root beer, two bottles of Wizard charcoal lighter, a Swiss beauty pad, and lemon-lime soda. The second receipt, dated the same night, was from the Rite Aid on Watt Avenue. It was for two bottles of denatured alcohol and a 24 ounce King Cobra beer.

The officers searched the Blazer and found scales and a pager under the passenger seat. In the back were chemicals associated with methamphetamine manufacturing. The officers suspected a methamphetamine lab and called a special drug officer and task force. Among the items found were 33 bottles of Revive, with 100 tablets in each bottle. Revive contains pseudoephedrine, a precursor to methamphetamine. Also found were Red Devil lye, hydrogen peroxide, red phosphorus, iodine crystals, rubber gloves, glass flasks, Wizard charcoal lighter fluid, plastic milk cartons with an amber liquid, denatured alcohol, bottles of water, a bag of ice, suitcases, wine carafes, a Pyrex dish, a coffee pot, a funnel, various containers and rubber tubing. No fingerprints were obtained from any of these items.

The chemicals found were sampled. The parties stipulated that the criminalist who analyzed the substances would testify as follows to the results. There was a bi-layered liquid containing methamphetamine and indications of P-2-P, a compound associated with the manufacture of methamphetamine. There were also red phosphorus and iodine, reagents commonly used in clandestine labs to manufacture methamphetamine from ephedrine or pseudoephedrine, and hydrochloric acid. All the chemicals necessary to manufacture methamphetamine from ephedrine or pseudoephedrine using red phosphorus and iodine or hydriodic acid were detected.

/////

| | |
|---|---|
| 1 | Brian Quirk, a Drug Enforcement Agency special agent, opined it was a pseudoephdrine reduction methamphetamine lab. In his opinion methamphetamine was being produced, as shown by the bi-layered liquid containing methamphetamine. The 33 bottles of Revive were evidence of a plan to produce more. That amount of pseudoephedrine was sufficient to produce 1400 dosage units of methamphetamine. It was stipulated that both Raya and Wakefield have knowledge of the nature and character of methamphetamine. . . . |
| 6 | David Raymond, an Oregon detective, testified about a search he conducted in Selma, Oregon. While he was conducting the search Raya and his wife, Naomi, came on the property. The property was 16 acres in rural Oregon; there was a cabin without electricity and a trailer. In the trailer were glassware, tubing, filters, funnels, cotton balls, and a flask in a suitcase with a pawn slip for Naomi Raya. In the cabin were documents for Roberto and Naomi Raya. There were also gallon jugs with an unknown liquid, a quart of muriatic acid, empty iodine containers, and a scale with methamphetamine residue on it. Outside were 25 empty pseudoephedrine containers and pseudoephedrine tablets. In the trash were three empty lye containers, an empty container of Wizard lighter fluid, a plastic bottle with white residue, letters to the Rayas, empty pseudoephedrine bottles, an empty jar of iodine crystals, an empty bottle of hydrogen peroxide, an empty bottle of rubbing alcohol, used filters, a baggie with red residue consistent with red phosphorus, and a spoon with a cotton ball that tested positive for methamphetamine. In Detective Raymond's opinion, the items were for the manufacture of methamphetamine. The items were similar to those found in the back of the Blazer. There was nothing unique, however, as to these items compared to other ephedrine reduction methamphetamine labs. During the search, Raya directed Naomi to unlock the trailer and cabin for the officers; she had the keys. . . . |
| 19 | Naomi Raya had been with Raya for 17 years and married to him for 14. They had three children together, ages 16, 13 ½, and 10 ½. She received no financial support from her husband, but gave him money. Raya did not live with her at the Arcade apartment. Naomi began using methamphetamine in 1992 to lose weight. She weighed over 200 pounds then and Raya was hanging around with prettier ladies. |
| 23 | Naomi testified the methamphetamine lab in the back of the Blazer was hers. She had learned to cook methamphetamine in Oregon. She participated in numerous cooks there. Raya did not know of her activities and he lost respect for her when he learned of the lab in Oregon. When she returned to California she resumed her manufacturing activities. She manufactured methamphetamine at the residence of a disabled woman for whom she worked. She also |

manufactured with two men at a house near Mather Air Base. She knew her colleagues only by their first names or nicknames and did not know their addresses. She described in detail the process she used to make methamphetamine.

September 13 was her wedding anniversary and she wanted to spend the night at a motel with Raya. Wakefield was going to baby-sit the children. She also had a vague plan to continue to manufacture methamphetamine. The night before she and a girlfriend purchased the Revive tablets in Reno. While she and Raya were at the motel, the friend and "her old man" would come and transfer the items from the back of the Blazer to their vehicle. Naomi boxed up al the necessary equipment and chemicals in the back of the Blazer.

About 8:00 p.m., Naomi and Raya picked up Wakefield and stopped to get something to eat. They returned to the apartment just before midnight. She told Raya and Wakefield she had to go to the store real quick. Raya got mad at her and yelled that she was wasting time and tweaking. She went to Rite Aid that night to get denatured alcohol; she also got beer as a gift for the friend who would pick up the equipment and chemicals. She went to the Rite Aid although it was far from her apartment because she had to stop at her friends. She told them she had not yet figured out what motel she and Raya were going to. Once she got a room, she would call them.

When Naomi returned from the store, Raya was still angry. Then she told him she still needed to get some soda and ice for the kids. Raya got even more angry and said he would go to the store. Naomi reached in her pocket and gave him some money. She asked him to also get some lighter fluid and cosmetic pads. She used the pads as a funnel. Raya and Wakefield left for the store. The bag of methamphetamine and the Rite Aid receipt must have been with the money she gave him.

Naomi testified a friend gave her the paper with the map and list of chemicals. She put it in her purse. She never saw the officers search her purse.

Naomi denied telling her mother she would take the rap for Raya. She denied she saw a transcript of the preliminary hearing. She denied she told her sister she would protect Raya and take the fall because she would only get probation.

. . .

Naomi's mother testified Naomi told her Raya had a prior record and was looking at substantial time so she was going to take the rap. Raya sent her a transcript of the preliminary hearing where the officers described the manufacturing process; she gave it to Naomi.

> According to Naomi's sister, Naomi said Raya had a prior record so she was going to take the rap. She was going to do it to protect her husband. She was going to stand by her husband until the end.

Pet., Ex. A at 2-9.

Petitioner asserted all of the claims that he presents in this action in his appeal to the California Court of Appeal. The Court of Appeal affirmed Raya's conviction. Pet., Ex. A at 29. The California Supreme Court denied a petition for review. Pet., Ex. B.

II.     Standards for Habeas Corpus Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA"). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (affirming lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief). See also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[1] Courts are not required to

---

[1] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeal held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court does not agree. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in

address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)). It is the habeas petitioner's burden to show that he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial

---

violation of the Constitution before he or she may obtain habeas relief. See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

6

of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an "'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  See <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir. 1999).

III.   <u>Arguments and Analysis</u>

   A.   <u>Admission of Detective's Testimony Regarding Prior Bad Acts (Claim 1)</u>

Petitioner argues that it was error to admit the testimony of the Oregon detective regarding petitioner's presence during a search of a methamphetamine manufacturing laboratory in Oregon.  The California Court of Appeal held that such evidence was prejudicial, but its admission constituted harmless error.  For reasons that follow, petitioner's claim fails to allege injurious error as mandated by <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993).

      1. <u>Contrary to Clearly Established Federal Law Standard</u>

Under 28 U.S.C. § 2254(d)(1), the court first examines whether the California Court of Appeal's opinion resulted in a decision that was contrary to clearly established federal law as determined by the Supreme Court of the United States.

The Oregon detective's testimony is not probative for any purpose other than to show the petitioner's propensity to commit the crime with which he was charged.  As found by the California Court of Appeal, the evidence is prejudicial as "it shows a disposition to manufacture methamphetamine."  Pet., Ex. A at 11.

/////

/////

/////

It is an open question whether the use of "prior crimes" evidence to show propensity to commit the charged crime is a violation of the Due Process Clause. Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991). For purposes of this analysis, this court will assume that the use of prior crimes evidence to show propensity is contrary to clearly established federal law.

        2. <u>Harmless Error Standard</u>

Under Brecht, the standard for determining whether habeas relief must be granted is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623. The Oregon detective's testimony did not have such an effect or influence, as explained below.

The California Court of Appeal found the error of admitting the detective's testimony to be harmless, stating:

> As to Raya, the evidence was strong. He was stopped after driving erratically late at night in a Blazer containing a methamphetamine lab, including a substantial quantity of pseudoephedrine, the precursor to methamphetamine. He had methamphetamine in his pocket, as well as receipts for recently purchased chemicals that are used in the manufacturing process. His defense was that all this incriminating evidence was Naomi's. This defense required the jury to accept her story that although she wanted to spend her wedding anniversary with her husband, she still intended to transfer the lab to friends that night. She was making last minute purchases of chemicals while trying to keep Raya from finding out about her activities, but was so careless as to not only let Raya run an errand in the Blazer, but to accidentally give him both methamphetamine and an incriminating receipt. The jury also had to reject strong rebuttal evidence that Naomi intended to take the blame to keep Raya from serving a lengthy prison sentence. Given the strength of the evidence against Raya, and the credibility problems with his defense, it is not reasonably probable he would have been acquitted of any count if the evidence of the Oregon lab had been excluded.

Pet., Ex. A at 13.

There was substantial evidence against petitioner. Petitioner was arrested at the scene of the crime, in a car being used to manufacture methamphetamine. RT 151-165. Petitioner's only defense was to place all the blame on his wife, Naomi. Particularly troublesome

to petitioner's defense was the testimony of Naomi's sister and mother. Each of them said Naomi said she was going to take the blame for petitioner to keep him from serving a long sentence. RT 983, 999, 1001. Furthermore, petitioner sent the transcript of his preliminary hearing to the mother, who gave it to Naomi, who thus had access to the appropriate facts on which to base her testimony. RT 986, 992.

Even assuming the use of prior crimes evidence to show propensity to commit the charged crime is contrary to clearly established federal law, enough other evidence was properly admitted at the trial against petitioner such that the detective's testimony did not have substantial and injurious effect or influence on the jury's guilty verdict.

B. Admission of Testimony of Rebuttal Witnesses Regarding Prior Conviction (Claim 2)

Petitioner argues that the testimony of Naomi's mother and sister was inadmissible hearsay and unduly prejudicial because both witnesses stated that petitioner had a prior conviction. The statements were made in the context of these witnesses' responding to the prosecutor's questions during trial, as to whether Naomi had said she would take the rap for petitioner because he had a prior record. RT 983, 999-1000. Petitioner's claim is barred by 28 U.S.C. § 2254(d) because the California Court of Appeal's decision was not contrary to clearly established federal law as determined by the Supreme Court of the United States.

In Estelle, 502 U.S. at 75, the Court held that the trial court's admission of evidence of the defendant's prior injury to his child was not enough to grant defendant's habeas petition. The evidence of this prior bad act was not used to show propensity to commit the charged crime, especially in light of a limiting instruction given to the jury. Id. Specifically, the court in Estelle stated that the introduction of the challenged evidence did not "so infuse the trial with unfairness as to deny due process of law." Id. Similarly, in Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991), the Ninth Circuit stated, "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even

/////

1 then, the evidence must 'be of such quality as necessarily prevents a fair trial.' (citation
2 omitted)."

3 The California Court of Appeal correctly found that the rebuttal testimony of the
4 mother and sister was not admitted to show propensity to commit the charged crime. Pet., Ex. A
5 at 15. Rather, the testimony that petitioner had a prior conviction explained Naomi's motivation
6 to testify falsely in order to help her husband. That petitioner's wife had a motivation to testify
7 falsely is a constitutionally permissible inference for the jury to draw from the evidence.
8 See Gullett v. Armontrout, 894 F.2d 308, 310 (8th Cir. 1990) (in evaluating evidence, jury could
9 have credited wife's "obvious bias" in favor of her husband). Further, the court eliminated any
10 reference to the term of years petitioner received for the conviction or that petitioner was a three
11 striker. RT 977 (in limine ruling); CT 277 & RT 1281 (jury instructed not to consider penalty).
12 In light of Estelle, the admission of prior bad acts evidence that is not used to show propensity,
13 coupled with an effort by the trial court to limit the prejudicial effect of the evidence, is not
14 enough to justify granting a habeas petition.

15 Moreover, the rebuttal testimony was not "of such a quality as necessarily
16 prevents a fair trial." Jammal, 926 F.2d at 920. Even without the testimony as to Naomi's
17 motivation for testifying, there was strong evidence supporting the conclusion that Naomi's story
18 was not to be believed, as reviewed by the Court of Appeal. Pet., Ex. A at 13. Naomi's mother
19 also had and shared the transcripts sent by petitioner, which would have enabled Naomi to testify
20 as to what materials were found in the car. RT 986, 992.

21 The jury could draw a permissible inference as to Naomi's motivation to testify
22 falsely from the rebuttal testimony. Furthermore, there was strong evidence of petitioner's guilt,
23 ensuring that any impermissible inference the jurors drew from the rebuttal testimony was not
24 determinative of the outcome of the case. Petitioner was not denied a fair trial.
25 /////
26 /////

  C. <u>Use of Jury Instruction for Reporting Juror Misconduct (Claim 3)</u>

  Petitioner argues his constitutional rights were violated by the giving of California Jury Instruction ("CALJIC") 17.41.1, which obligates jurors to report instances of juror misconduct during deliberation. This claim is barred by 28 U.S.C. § 2254(d). In <u>Brewer v. Hall</u>, 378 F.3d 952, 954 (9th Cir. 2004), the court stated, "There is no clearly established federal law determined by the Supreme Court that indicates that the use of CALJIC 17.41.1 was constitutionally improper . . ." Because there is no clearly established federal law on this issue, the state court's resolution cannot run afoul of federal law and habeas corpus relief is not available.

  D. <u>Lack of Lesser Included Offense Jury Instruction (Claim 4)</u>

  Petitioner claims that the trial court's failure to issue a jury instruction on the lesser-included offense of attempt was a denial of due process. This claim as well is barred by 28 U.S.C. § 2254(d).

  There is no clearly established federal law regarding a trial court's failure to issue a jury instruction on lesser included offenses in a non-capital case. As a result, the Ninth Circuit has taken the position that "such a claim fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." <u>James v. Reese</u>, 546 F.2d 325, 327 (9th Cir. 1976). However, an exception may arise when the requested instruction was necessary to the theory of defense. <u>Bashor v. Risley</u>, 730 F.2d 1228, 1240 (9th Cir. 1984); <u>cf</u>. <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106 (9th Cir. 1998) (mentioning no exception to the general rule). In <u>Bashor</u>, the court found the defense theory was not centered around a lesser included offense because defense counsel did not seek such an instruction at trial. 730 F.2d at 1240.

  Petitioner was not prevented from presenting his theory of defense at trial. Petitioner asserts that the jury should have been instructed on the lesser included offenses of "attempted manufacture or unlawful possession of laboratory equipment and chemicals" with respect to the charge of manufacture of methamphetamine. Pet. at 13-14 & n.3. However, the

11

only jury instruction on lesser included offenses sought by defense counsel was one regarding the offense of possession as a lesser included crime to transport.  RT 1072.

The defense theory was made obvious in closing argument when defense counsel stated, "The only issue of significance in this case, I will tell you right now is whether or not Mr. Raya knew what was in the back of that Blazer plain and simple."  RT 1136.  To find the petitioner guilty merely of attempted manufacture still would require the finding of intent to commit the crime, which would conflict with the defense theory that petitioner did not even know that he was transporting materials to manufacture methamphetamine.  The defense pointed the finger of blame at petitioner's wife, claiming that she not only put the materials in the car, but had even handed petitioner a bag of methamphetamine and a receipt for materials used in the manufacturing process, which petitioner unknowingly placed in his pocket.  RT 1144, 1147-1148, 1152-1154.  It was not fundamentally unfair to deny the jury instructions on lesser included offenses of attempted manufacture or unlawful possession when defense counsel's single-minded goal was to portray petitioner as blameless.

IV.     Conclusion

For all the foregoing reasons, petitioner's application for a writ of habeas corpus should be denied.

IT IS HEREBY RECOMMENDED petitioner's application for a writ of habeas corpus be denied.

/////
/////
/////
/////
/////
/////
/////

1       These findings and recommendations will be submitted to the United States
2 District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within
3 twenty days after being served with these findings and recommendations, any party may file
4 written objections with the court and serve a copy on all parties.  Such a document should be
5 captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the
6 objections shall be served and filed within five days after service of the objections.  The parties
7 are advised the failure to file objections within the specified time may waive the right to appeal
8 the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
9 DATED: June 6, 2006.

                                              UNITED STATES MAGISTRATE JUDGE

raya1726.fr